**FILED**
**Mar 10, 2022**
**01:24 PM(CT)**
**TENNESSEE**
**WORKERS' COMPENSATION**
**APPEALS BOARD**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Denise R. Lewallen | ) | Docket No. 2019-01-0366 |
| | ) | |
| v. | ) | State File No. 14833-2018 |
| | ) | |
| Home Healthcare of East | ) | |
| Tennessee, Inc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | Heard January 25, 2022 |
| Compensation Claims | ) | via Microsoft Teams |
| Audrey A. Headrick, Judge | ) | |

---

### Affirmed and Certified as Final

---

The employee suffered multiple injuries when she was involved in a car accident while in the course and scope of her employment. The employer accepted the claim as compensable and provided workers' compensation benefits, including extensive medical care. Upon reaching maximum medical improvement, the parties were unable to agree regarding the extent of the employee's vocational disability. After a trial, the court found the employee to be permanently and totally disabled. The employer has appealed. Having carefully reviewed the record, we affirm the trial court's decision and certify the trial court's order as final.

Judge Pele I. Godkin delivered the opinion of the Appeals Board in which Presiding Judge Timothy W. Conner and Judge David F. Hensley joined.

Tiffany B. Sherrill, Knoxville, Tennessee, for the employer-appellant, Home Healthcare of East Tennessee, Inc.

Tony Farmer, Knoxville, Tennessee, for the employee-appellee, Denise Lewallen

### Factual and Procedural Background

Denise Lewallen ("Employee"), a fifty-three-year-old resident of Monroe County, Tennessee, worked as a CNA for Home Healthcare of East Tennessee, Inc. ("Employer"). Her job involved traveling to clients' homes to provide home healthcare services such as preparing meals, assisting with personal hygiene, and other similar services. On February 20, 2018, while on her way to a client's home, Employee was involved in a car accident

1

and suffered multiple injuries. She was transported via helicopter to UT Medical Center in Knoxville and was seen by Dr. Scott Smith, the orthopedic surgeon on call. Medical providers determined she suffered injuries to her right ankle and foot, her left tibia, and her left clavicle. She also complained of right forearm pain, which was later determined to be caused by a fractured ulna.

Dr. Smith performed surgery on Employee's right ankle and foot and left tibia on the day of the accident. One week later, Dr. Smith performed additional surgery to address Employee's other injuries, including her fractured left clavicle. Employee continued to receive care from Dr. Smith for her injuries and remained off work. Dr. Smith initially projected that Employee would be out of work for six months; however, on May 10, 2018, Employee requested Dr. Smith to allow her to return to work, which he did as of June 1, 2018. Dr. Smith imposed work restrictions limiting her work to four hours a day with a maximum of standing and walking for two hours in fifteen-minute intervals. Dr. Smith also allowed Employee to resume working in the field but limited her to half days. On June 14, Employee requested that she be allowed to return to work performing her home healthcare duties. Dr. Smith subsequently allowed Employee to return to work full time, recommending that she start in the office and transition to working in clients' homes. On July 12, 2018, Dr. Smith allowed Employee to return to work full time with no restrictions.

On September 18, 2018, Employee underwent additional surgery on her right ankle and foot involving a bone graft with bone harvested from her iliac crest. Employee remained off work until January 28, 2019, when Dr. Smith allowed her to return to work with no restrictions. At that time, Dr. Smith noted that Employee had been progressing more slowly than anticipated but wanted to return to work. After working for approximately two weeks, however, Employee resigned, stating that she was in too much pain and believed she was unable to perform the job in a manner safe to her and her clients.

On March 11, 2019, Employee saw Dr. Smith for treatment of an infection in her right forearm related to the surgery he had performed to treat her ulnar fracture. He noted she may need to have the wound debrided and hardware removed if the infection was not controlled by medication. He also noted that Employee had resigned from her employment due to safety concerns and being unable to perform her job duties. He recorded that her right ankle continued to give her significant problems and that, as a result, she was not able to perform the duties of a home healthcare worker. He further noted that she would be "better served in a more sedentary role." Nonetheless, Dr. Smith concluded Employee had reached maximum medical improvement, and he assigned no work restrictions despite the ongoing infection in Employee's right forearm. In addition, he assigned a six percent anatomical impairment rating. Four weeks later, Employee underwent surgery to remove the hardware in her right forearm due to the persistent infection.

The last medical record from Dr. Smith, dated February 22, 2021, reflects that Employee still had complaints of pain and weakness in her right forearm, shoulder, and

2

ankle. He noted that she had developed posttraumatic arthrosis and subtalar arthrodesis with scarring and pain in the right foot and ankle. He stated that she still had disability from the injuries and would benefit from strengthening exercises. Dr. Smith observed that Employee was limited in her activity as a result of the injuries but found there was no need for additional surgery. He recommended Employee undergo a Functional Capacity Evaluation ("FCE") to assess her ability to return to work.

On April 28, 2021, Employee underwent the FCE. The report of the evaluation states that Employee demonstrated full and consistent effort and was able to meet the demands of a job in the "light" physical demand category. The following day, Dr. William Kennedy authored a report based on a records review requested by Employee for the purpose of determining Employee's permanent medical impairment. He assigned permanent anatomical impairments to the body as a whole of ten percent for Employee's right lower extremity injuries, eight percent for her left lower extremity injuries, two percent for her right upper extremity injuries, and two percent for her left clavicle injury.

In addition to the injuries that Dr. Smith treated, Employee complained of neck pain that radiated into her right arm. She saw Dr. Paul Johnson, another orthopedic surgeon in the same practice as Dr. Smith, for those complaints beginning on June 25, 2019. Although the claim for the cervical spine was initially disputed, Dr. Johnson provided correspondence in which he stated that the

> spinal condition I am treating and recommending surgery to address was primarily caused by the 2-20-2018 motor vehicle accident. That is, the motor vehicle accident contributed more than fifty percent (50%) in causing the underlying condition, considering all causes. Likewise, it is my opinion[] that the recommended surgical procedure is treatment that is reasonably derived from the ODG Guidelines.

The recommended surgery was ultimately approved, and Dr. Johnson performed a cervical fusion at C4-5, C5-6, and C6-7 on December 16, 2019. At a follow-up visit on February 11, 2020, Dr. Johnson noted that Employee was back to her pre-surgical level of activity and that her radicular pain had resolved. On September 29, 2020, Dr. Johnson placed Employee at maximum medical improvement and assigned a six percent permanent medical impairment rating for her cervical condition.

Employee followed up with Dr. Johnson on March 30, 2021, with questions regarding her work status. Dr. Johnson indicated he did not think an FCE would be beneficial, as Employee had already resigned her position with Employer. Instead, he recommended that Employee should "work based on her perception of her capabilities," adding that she "may well need to limit herself to some degree."

Following a September 13, 2021 trial, the court issued an order finding Employee to be permanently and totally disabled. The court noted that Dr. Smith signed a Physician Certification Form stating that Employee could not return to her previous employment and that Dr. Johnson had opined that Employee should work "based on her perception of her capabilities." The court observed that Employee had significant impairment ratings and that her testimony supported the conclusion that she had no transferrable job skills that would be applicable to a position that falls within the light physical demand category. The court also noted that vocational testimony was not required for a finding of permanent disability and ordered Employer to pay permanent total disability benefits beginning September 30, 2020, until Employee is eligible for social security old age benefits. Employer has appealed.[1]

## Standard of Review

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2021). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2021).

## Analysis

Employer raises a single issue on appeal, questioning whether the trial court erred in awarding permanent total disability benefits. Employee raises an additional issue on appeal, asserting she is entitled to an award of attorneys' fees in accordance with Tennessee Code Annotated section 50-6-226(d)(1)(B) for Employer's alleged wrongful failure to pay the "original award" of permanent disability benefits as provided in section 50-6-207(3)(A). However, during oral argument, Employee conceded that the issue of

---

[1] Employee also made a claim for a hernia that she alleged resulted from the bone harvesting procedure on her iliac crest to treat her ankle injury as well as a claim for mental health treatment for posttraumatic stress disorder. Employer denied Employee's requests for treatment related to those claims. At trial, the court concluded Employee's alleged hernia and her claim for posttraumatic stress disorder were not compensable, and those conclusions have not been raised as issues on appeal.

4

attorneys' fees under section 50-6-226(d)(1)(B) was not raised in the trial court. As we have stated previously, the role of an appellate court is not to hear matters in the first instance, but to review trial courts' dispositions of the matters before them. *Keyes v. Bridgestone*, Docket No. 2016-06-2007, 2017 TN Wrk. Comp App. Bd. LEXIS 33, at *6 (Tenn. Workers' Comp. App. Bd. May 18, 2017). Accordingly, the issue of attorneys' fees under section 50-6-207(3) was waived. *See* Tenn. Comp. R. & Regs. 0800-02-22-.07(3) (2020); *Norton v. McCaskill*, 12 S.W.3d 789, 795 (Tenn. 2000).

Turning to the merits of Employer's appeal, we first note that Employer argues in its brief that the trial court abused its discretion in awarding permanent total disability benefits. An award of disability benefits is not a matter that lies within the discretion of the trial judge. As noted above, the standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7). Accordingly, we look to see whether the preponderance of the evidence supports the trial court's findings and conclusions, giving a presumption of correctness to the trial court's findings of fact.

Both Dr. Smith and Dr. Johnson testified by deposition. Dr. Smith testified that he agreed with the results of the April 2021 FCE and adopted the findings as his own, describing the findings as "very accurate." He also adopted Dr. Kennedy's impairment ratings, stating that the ratings were fair and took into account all of Employee's injuries. Moreover, he stated that the six percent impairment rating he provided on March 11, 2019 was "not valid at all." Addressing the functional impact of Employee's injuries on her day-to-day life, Dr. Smith testified that a particular challenge in this case was the bilateral nature of Employee's injuries, stating:

> One major challenge is it is bilateral, both sides. So it is sort of hard to favor one. And it also makes it very challenging immediately postop because you're wheelchair bound and you develop tremendous atrophy and weakness of muscle. So it is very hard to recover completely from that for sure.
>
> I mentioned that the left ankle is doing fairly well, but not having normal motion, that's a little bit awkward especially when you are trying to do stair climbing or descending stairs, anything with uneven ground. In the yard, or slopes, or things like that become challenging. And that is especially true of the right side. She has considerable stiffness there. Despite a successful fusion and healing of her nonunited talus, she still has considerable pain there. The forefoot, I don't think, bothers her too much. But all of that sort of scarring stiffness, lack of mobility affects shoe-fitting, and so it is difficult for her to be on her feet very long. It just kind of fatigues early, might have swelling and pain. And that's the major disability she has of being very active.

Dr. Smith also testified that Employee was unsuccessful in her attempt to return to work, explaining she had "too much pain to tolerate the full working day of standing and walking." When asked whether he would expect Employee to be able to tolerate a full workday that required her to be on her feet, Dr. Smith said he "would agree with the [FCE] that she would only be able to do very light light duty, in other words, basically a desk job sitting 99 percent of the time."

On cross-examination, Dr. Smith was asked about the type of work and physical activities Employee could perform. He testified that "it has to be a sedentary – an exclusively sedentary position maybe is a better way to describe it. . . . She could walk in, [and] could probably go run a file to someone, you know, every now and then and tolerate that." When questioned about Employee's impairment, Dr. Smith stated:

> You could see her probably walking down the hall and wouldn't seem too abnormal, but I know she has a lot of limitations when she gets outside, stamina capacity is low, she can't do very much. And so to me that got her beyond mild, which would be something that would have allowed her to work probably, at least part time, to a moderate impairment or disability.

Addressing Employee's limitations, Dr. Johnson testified that his opinion only addressed Employee's cervical injury, characterizing the limitations related to her cervical injury as "[u]nlike the injury she sustained in this accident [that was] not related to her spine." He testified that, generally, a cervical injury like Employee suffered and the treatment for that injury do not "limit people from doing many things that most of us would do." He opined that Employee should operate under "self-imposed" restrictions, based on what she knows she can or cannot tolerate. When asked whether it is better for patients to return to work, he responded, "[i]f she felt she was able to, yes. It would be better for her mentally, physically, yes. Absolutely. Socially."

Employee testified that she dropped out of high school but obtained her GED two or three years later. She testified that soon after obtaining her GED she received her certification as a nursing assistant. In addition, she obtained a certification in phlebotomy approximately five years ago. She testified she initially worked in a nursing home and later started providing home healthcare. In 2002, she began working for Employer, performing the same type of personal care for clients in their homes that she had provided in the nursing home setting. Employee stated that she worked 40-plus hours per week, even taking on a second job so she could buy a home.

Employee testified about her efforts to return to work after the accident, describing her attempts to lift one of her clients and nearly dropping her. She stated, "I could not physically do it. The lady I got up, I just about dropped her in [sic] the floor, and that's when I said, that's it, I'm done, I'm going to hurt her, I'm going to hurt me, [and] I can't

6

do it." She testified that she wanted to work but stated that driving was painful and was "killing my ankle," adding that her feet "would be pounding" when she got home.

Employee acknowledged that she had not attempted to work at any jobs that would be considered sedentary, such as office work or a call center. She described being able to walk her dog short distances, perform some household chores, drive to the store and medical appointments, and other tasks of daily living. However, she testified that everything takes much longer and that she is not able to complete tasks as quickly as she could before her accident. She also testified that she has never worked on a computer and does not own a computer.

Connie Norton, the regional director of operations for Employer at the time Employee was injured, testified that Employee was a hard worker and was very reliable. She said she believed Employee was being truthful when Employee testified that she did not believe she could work. Ms. Norton further expressed her opinion that Employee had good "people skills" and was able to learn new skills and techniques.[2]

Employer does not dispute the extent of Employee's physical injuries or her inability to return to her previous employment. The trial court found Employee to be credible, and Employer has provided no basis for us to question that finding. Employee testified that she was unable to return to a job in home health care due to the injuries she sustained in the 2018 car accident. Moreover, Employee described her current limitations and how those limitations affect activities of daily living, and she explained why she did not believe she could find employment in the open labor market due to her limitations. Employee's testimony regarding her physical limitations was supported by Dr. Smith's opinion that she can, at most, work at a sedentary position "99% of the time," and by Dr. Johnson's opinion that she should let her perception of her abilities dictate her activities. Employer has offered no countervailing medical proof or expert vocational proof to suggest Employee is able to obtain employment in the open labor market that would bring her an income or that she is otherwise able to return to gainful employment.

While expert vocational proof may be a preferred method of establishing permanent total disability, it is not necessary in every case. *See Cleek v. Wal-Mart Stores, Inc.*, 19 S.W.3d 770 (Tenn. 2000). Instead, the Tennessee Supreme Court has provided the following guidance:

> [A]ny inquiry as to whether an employee is permanently and totally disabled from a legal perspective must focus on the employee's ability to return to gainful employment. Accordingly, the assessment of permanent total disability is based upon numerous factors, including the employee's skills

---

[2] Lexia Absher, a friend and former co-worker of Employee, also testified. Her testimony was cumulative of Employee's testimony, and, accordingly, we do not address her testimony.

and training, education, age, local job opportunities, and his [or her] capacity to work at the kinds of employment available in his [or her] disabled condition. Although a rating of anatomical disability by a medical expert is also one of the relevant factors, the vocational disability is not restricted to the precise estimate of anatomical disability made by a medical witness. In addition, the employee's own assessment of her physical condition and resulting disability is competent testimony that should be considered . . . .

*Id.* at 774 (internal citations and quotation marks omitted).

Employee is fifty-three years old, has a GED, and had worked as a CNA in the home healthcare field for twenty-eight years at the time of her injuries. Her work was classified in the medium physical demand category. The 2021 FCE placed Employee in the light physical demand category. She attempted to return to her pre-injury employment but was unable, as supported by Dr. Smith's opinion and the Physician Certification Form he completed. Employee continues to have significant difficulties with her injuries, including pain and weakness. Employee testified that she does not have any computer skills or other transferrable job skills applicable to the sedentary physical demand category, and Employer presented no evidence, expert or otherwise, to the contrary. Moreover, her permanent medical impairment ratings are significant, further supporting the testimony concerning her ongoing functional limitations. In light of the record before us, including Employee's uncontradicted lay testimony, we conclude that the preponderance of the evidence supports the trial court's determination that Employee is permanently and totally disabled.

## Conclusion

For the foregoing reasons, we affirm the trial court's September 29, 2021 order and certify it as final. Costs on appeal are taxed to Employer.



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Denise R. Lewallen | ) | Docket No. 2019-01-0366 |
| | ) | |
| v. | ) | State File No. 14833-2018 |
| | ) | |
| Home Healthcare of East | ) | |
| Tennessee, Inc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | Heard January 25, 2022 |
| Compensation Claims | ) | via Microsoft Teams |
| Audrey A. Headrick, Judge | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 10th day of March, 2022.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|---|---|---|---|---|---|
| Tiffany Sherrill | | | | X | tbsherrill@mijs.com |
| Tony Farmer<br>Barbara Gibson<br>Landon Lackey | | | | X | tony@farmerdreiser.com<br>bgibson@farmerdreiser.com<br>landonlackey@hotmail.com |
| Audrey A. Headrick, Judge | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |

Olivia Yearwood
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov